## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA E. McBROOM, | ) | CASE NO. 4:09CV2417 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |
| BARNES & NOBLE BOOKSELLERS, | ) | |
| INC., | ) | |
| | ) | |
| DEFENDANT. | ) | |

Plaintiff Patricia McBroom ("Plaintiff" or "McBroom") filed the present employment action against Defendant Barnes & Noble Booksellers, Inc. ("Defendant" or Barnes & Noble"), claiming that Defendant discharged her in retaliation for her participation in protected activity, in violation of federal and Ohio statutory law.

Pursuant to Fed. R. Civ. P. 56(c), Defendant seeks summary dismissal of Plaintiff's First Amended Complaint. (Doc. No. 23.) Plaintiff opposes the motion, and Defendant has filed a reply. (Doc. Nos. 38 and 41, respectively.)

For the reasons that follow, Defendant's summary judgment motion is **DENIED**.

**Background**

McBroom began her employment with Barnes & Noble in August 1998 as an Assistant Store Manager ("ASM") at Defendant's Boardman, Ohio store. (Doc. No. 12, First Am. Compl. at ¶ 4; Doc. No. 24, Deposition of Patricia McBroom at 23.) At all times relevant to the present litigation, Plaintiff's direct supervisor, and the person

responsible for evaluating Plaintiff's work, was Store Manager Katherine Conner. There is no dispute that, from 1998 to 2002, Plaintiff performed her ASM duties adequately, and consistently received positive reviews and raises. (Doc. No. 34, Deposition of Katherine Conner at 30.)

In 2003, Conner issued Plaintiff a Performance Development Plan (PDP). Conner prepared the PDP for Plaintiff after all management level employees at the Boardman store, including Conner and Plaintiff, received annual evaluations that indicated that their performance "needs improvement."[1] (Conner Dep. at 138.) Plaintiff's 2003 PDP identified two specific areas in which improvement was needed: knowledge regarding the music department activities and café products, and the confrontation of problems between sales staff. (Doc. No. 32-11, 2003 PDP.) With respect to the latter, the PDP cited a situation where Plaintiff permitted a sales associate to stay on the sales floor, even though he was creating a disturbance to customers and other employees, as well as an incident where Plaintiff failed to intervene when two employees were involved in a heated verbal exchange. (*Id.*) It is undisputed that Plaintiff successfully completed the action steps outlined in the 2003 PDP (Connor Dep. at 33; Doc. No. 32-12), and that her 2004 personal evaluation reflected that her performance "meets" expectations for her position. (*Id.* at 142). There is no dispute that Plaintiff continued to receive acceptable evaluations until 2007. (*See* Doc. Nos. 32-15 and 32-17.)

---

[1] Plaintiff explained that "because the overall store rating was Needs Improvement, then everyone's individual evaluation needed to show Needs Improvement." (McBroom Dep. at 107.) This observation is confirmed by Conner, who testified that everybody (in management at the Boardman store) received a Needs Improvement rating because the store reported poor "statistics" for the year. (Conner Dep. at 139.) She further explained that "statistics" refers to "store sales, store short, that type of number." (*Id.*)

In March 2007, employee Michael Willings was transferred to Defendant's Boardman store, where he took over the other ASM position. (Doc. No. 37, Deposition of Michael Willings at 14-15.) In late April 2007, Plaintiff complained to Conner that Willings had engaged in inappropriate behavior that made her feel "uncomfortable."[2] (McBroom Dep. at 45.) Specifically, McBroom referenced a time when Willings had begun massaging her shoulders without her permission, and two other instances where Willings made lewd remarks in front of her. (*Id*. at 44-45; Conner Dep. at 16; Doc. No. 34-1, BN 29-31, Written Complaint.) Conner reported this to Bruce Feagins, the District Manager responsible for the Boardman store. Feagins prepared a report, referring to McBroom's complaint as one alleging "sexual harassment," and conducted an investigation. (Doc. No. 32-18, Report.)

On May 15, 2007, Feagins, Conner, and Plaintiff met at an off-site location to discuss the results of the investigation. (Report; Connor Dep. at 59.) Feagins advised Plaintiff that none of the other employees in the Boardman store had ever witnessed Willings acting inappropriately toward Plaintiff. (Report.) He assured Plaintiff, however, that he would continue to monitor the situation. Feagins's report reflects that Plaintiff was satisfied with the Company's handling of her complaint. (*Id*.)

That same day (May 15, 2007), Willings sent Conner an e-mail setting forth a list of complaints Willings wished to lodge against Plaintiff. (Conner Dep. at 75-81.) In this correspondence, Willings mentioned situations where he believed that

---

[2] Plaintiff first made her complaint orally to Conner on April 20, 2007. She reduced her complaint to writing on April 23, 2007. (McBroom Dep. at 49-52; Doc. No. 34-1, BN 29-31, Written Complaint.)

Plaintiff had been disrespectful to him and had failed to work with him in "a partnership." (*Id.* at 76.)

On May 25, 2007, Conner issued Plaintiff a Field Management Learning Plan. (Conner Dep. at 52-53; McBroom Dep. at 168-69.) In the Learning Plan, Conner challenged Plaintiff to "coach store team to think strategically," "balance [] individual needs with total store needs," and "make [] personal extra effort to assume additional responsibilities and provide assistance to all areas of the store." (McBroom Dep. at 169, Ex. 15.) Defendant maintains that Learning Plans are not necessarily negative or considered discipline, but are really designed to be teaching tools. (Conner Dep. at 53.)

On June 16, 2007, Conner issued a Performance Development Plan (PDP) to McBroom. (Conner Dep. at 55; Doc. No. 33-8, PDP.) The PDP was prompted by the fact that McBroom had allegedly discussed her sexual harassment complaint with a subordinate, Amy Neral. (Conner Dep. at 56-58; PDP.) The PDP also identified the implementation of company policies and the promotion of a store climate of cooperation as areas that needed improvement. (June 16, 2007 PDP.) Three months later, on September 12, 2007, Plaintiff was issued another PDP. The plan, again, identified the failure to properly implement and maintain company policies and standards as reasons prompting the discipline. It also identified talent development, recruiting, and managing performance as areas that were in need of improvement. (Doc. No. 33-11, September 12,

2007.) Plaintiff received two more PDPs in January and February 2008.[3] (Doc. No. 33-12 and 33-15.)

Conner testified in her deposition that, as early as July 23, 2007, she was actively looking for Plaintiff's replacement. (Conner Dep. at 159.) Conner explained that the reasons supporting her desire to replace Plaintiff were documented in the various performance appraisals and PDPs. (*Id.* at 127-128.) Ronald Mahoney, Regional Human Resources Director, testified that, in August 2007, he received a phone call from Feagins inquiring about the possibility of terminating Plaintiff's employment. (Doc. No. 40, Deposition of Ronald Mahoney at 37.) Feagins, along with Conner, contacted Mahoney again in October 2007 seeking Mahoney's input on discharging Plaintiff. (Mahoney Dep. at 55.) Specifically, Feagins was seeking reassurance that he had "everything lined up and ready for separation." (*Id.* at 55-56.) Mahoney did not recommend discharge at that time, however, finding that Feagins could not yet support such a decision. (*Id.* at 56.)

Plaintiff was finally separated from her position with Defendant on July 7, 2008, fifteen months after she reported Willings's behavior to Conner. (McBroom Dep. at 302.) The ultimate decision to discharge was made by Feagins. (Mahoney Dep. at 55.)

Plaintiff initially filed the present action in the Mahoning County Court of Common Pleas on August 28, 2009. Defendant removed the action to this Court on October 16, 2009. (Doc. No. 1, Notice of Removal.) The First Amended Complaint contains two causes of action. In Count One, Plaintiff alleges that her discharge

---

[3] During this time period, Plaintiff also received numerous negative performance appraisals. (*See* Doc. Nos. 33-18 and 33-19.

constituted unlawful retaliation for her engaging in protected activity, in violation of Ohio Rev. Code § 4112.02(I). Count Two raises the same retaliatory conduct under Title VII, 42 U.S.C. § 2000e-3.

**Standard**

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. […]

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. […] The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the

6

evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

**Analysis**

Plaintiff frames her retaliation claims in terms of both federal and Ohio

7

law. "For retaliation claims in Ohio, Federal law provides the applicable analysis for reviewing retaliation claims." *Baker v. Buschman Co.*, 127 Ohio App. 3d 561, 568 (Ohio Ct. App. 12th Dist. 1998) (internal citation omitted). As such, the same burden shifting analysis that governs the Court's consideration of retaliation claims under Title VII applies to retaliation claims under Ohio Rev. Code § 4112. *See Garner v. Cuyahoga County Juvenile Court*, 554 F.3d 624, 639 (6th Cir. 2009); *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 544 (6th Cir. 2008). Because the law governing each claim is the same, and the parties' respective arguments apply equally to Plaintiff's federal and state retaliation claims, the Court will consider both claims together.

Title VII prohibits an employer from retaliating against an employee for engaging in protected activity. 42 U.S.C. § 2000e-3. Absent direct evidence of retaliation, as is the case here, claims for retaliation are "subject to the same *McDonnell Douglas* burden-shifting framework as discrimination claims." *Halfacre v. Home Depot*, *U.S.A., Inc.*, 221 Fed. App'x 424, 431 (6th Cir. 2007) (citing *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563-64 (6th Cir. 2004)). "That is, if a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate reason for its employment action; if the defendant meets that burden, the plaintiff can prevail only by showing that the articulated reason is false or pretextual." *Id*. (citing *Wrenn v. Gould*, 808 F.2d 493, 500-01 (6th Cir. 1987)).

Under this framework, a plaintiff must first establish a prima facie case of retaliation by a preponderance of the evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To establish a prima facie case of retaliatory discrimination, a plaintiff must show: "(1) [s]he engaged in activity protected by Title VII, (2) [the

8

employer] knew [s]he engaged in this activity, (3) [the employer] subjected [her] to an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action." *Halfacre*, 221 Fed. App'x at 431 (citing *Singfield*, 389 F.3d at 563.) *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007).

### A.        Plaintiff's Prima Facie Claim

#### 1.    *Plaintiff Engaged in Protected Activity*

When Plaintiff complained to her direct supervisor, Conner, about Willings's behavior, first orally on April 20, 2007, and later in writing on April 23, 2007, she identified three specific instances that made her feel "uncomfortable." (McBroom Dep. at 49-52.) In her deposition, Plaintiff testified that:

> One time in the office when he came in behind me and stated—I was working on the computer and he came in and started massaging my shoulders. I had no idea who it was because he hadn't said anything, he just walked up behind me. And so it was a swivel chair and I whipped around to see who it was because, as far as I was concerned, that was too intimate a gesture for someone to make at a workplace.

(McBroom Dep. at 45.) The second incident occurred during a conversation with Conner and Willings regarding the number of special order items. Willings made a reference to "suggestive selling" while winking and smiling. Plaintiff believed that this comment was prompted by her own observation that customers have "needs" that Barnes & Noble tries to fill. According to Plaintiff, Willings then yelled at her to look at him and when she did, Willings licked his lips in a manner that was "overtly sexually suggestive." (Written Complaint at BN29-30.) A third incident revolved around the tipping over of a V-Cart. After the cart tipped, Willings made reference to an "erection." When Plaintiff explained

9

to Willings that she had "wacked her head" on the cart, Willings asked her to repeat what she had said and laughed at her. (*Id*. at BN30.)

Title VII protects two types of retaliation actions, participation and opposition. 42 U.S.C. § 2000e-3(a). "Participation" activity occurs when the protected activity involves making a charge, filing a complaint, testifying, or participating in an investigation or proceeding under Title VII. *Booker v. Brown & Williamson Tobacco* Co., *Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989). "Opposition" activity occurs when the employee is opposing a violation of Title VII. *Id*. Plaintiff's complaint would arguably fall into the latter category.

According to Defendant, however, Plaintiff cannot establish that she engaged in protected activity because no reasonable person would believe that the conduct of which Plaintiff complained was sexual harassment. With respect to retaliation, the question is not whether the conduct of which Plaintiff complained was legally sufficient to support a claim of sexual harassment under Title VII. *See Johnson v. University of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) ("[A] violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful."); *Booker*, 879 F.2d at 1312 (the employee does not "bear the entire risk that [the conduct complained of] is in fact lawful […]"). Instead, "[a] plaintiff must demonstrate that her opposition to an alleged unlawful employment practice was reasonable and based on a good-faith belief that the employer was acting in violation of the employment discrimination statutes." *Finch v. Xavier Univ.*, 689 F. Supp. 2d 955, 966 (S.D. Ohio 2010) (citing *Johnson,* 215 F.3d at 579). *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001).

10

"Sexual harassment is actionable under Title VII only if it is 'so severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Clark County Sch. Dist.*, 532 U.S. at 270 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)). To determine whether a work environment is sufficiently hostile or abusive to violate Title VII, the Court must look at the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Again, because Plaintiff alleges retaliation, and not discrimination or harassment, the focus is on how the reasonable person would receive the alleged harassment.

Here, the facts, if believed, support a finding that Plaintiff had a reasonable and good faith belief that Willings's conduct constituted unlawful sexual harassment. In Conner's prepared notes from her discussion with Plaintiff, she reported that Plaintiff indicated that she believed that Willings's comments contained "overt sexual references." (Conner Dep., Ex. B. See also Written Complaint at BN29.) Moreover, Plaintiff explained Willings had touched her in ways that went beyond normal professional behavior, and underscored the fact that he had humiliated her by making sexual inferences in front of other employees. Conner's notes further indicate that Plaintiff expressed the concern that "I really do not want to keep fending off-or tolerating sexually explicit inferences or [sic] a physical moment. I would like to do my job without fear of being harassed or intimidated or embarrassed." (Written Complaint at BN29-31.) At a minimum, there is a question of fact as to whether a reasonable person would have

11

believed that these three sexually charged incidents could have created a severe and pervasive hostile working environment. *See, e.g., Bonar v. Romano*, 2010 U.S. Dist. LEXIS 30116, at *13 (S.D. Ohio Mar. 26, 2010) (Whether sexual comments and a massage by a male co-worker was "severe or pervasive so as to amount to a hostile work environment is for the trier of fact to assess.") *See generally, Hawkins v. Anheuser-Busch, Inc*., 517 F.3d 321, 333 (6th Cir. 2008) (quoting *Jordon v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)) ("Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is 'quintessentially a question of fact.'")

Case law relied upon by Defendants does not demand a contrary in result. In *Clark*, the plaintiff, her supervisor, and a third individual met to review the psychological evaluation report of four job applicants. The report of one candidate disclosed an incident where the candidate told a co-worker "I hear making love to you is like making love to the Grand Canyon." 532 U.S. at 269. After reading the comment, one of the plaintiff's colleagues looked at the plaintiff and said "I don't know what that means." The supervisor responded by saying "Well, I'll tell you later." *Id*. The Supreme Court found that no reasonable employee would have believed that this one incident violated Title VII inasmuch as the initial remark was contained in a employment file which the plaintiff and the other employees were required to consider as part of the interview process and which the plaintiff admitted did not bother her. *Id*. at 271. Moreover, the vague comments from her supervisor and co-worker that followed were isolated and could not have been considered "extremely serious." *Id.*

Similarly, in *Soehner v. Time Warner Cable, Inc*., the court rejected the

12

plaintiff's prima facie case because it found that the plaintiff had failed to put the employer on notice that he was attempting to engage in protected activity. In so ruling, the court observed that certain complaints made by the plaintiff were vague and did not reference conduct made unlawful by Title VII, but instead focused on unkind and callous comments of a non-discriminatory nature. *Soehner*, 2009 U.S. Dist. LEXIS 106619, at *23-*24 (S.D. Ohio Nov. 16, 2009). Further, his comment to a member of management that his supervisor had asked him to service him sexually was made in connection with an investigation of sexual harassment by another employee. "Plaintiff's comments focused generally on his opinion of [his supervisor] and could not have put [the employer] on notice that Plaintiff was engaging in protected activity […]." *Id*. at *25.

In contrast to these cases, Plaintiff clearly put her supervisor on notice that she believed that she had been the victim of sexual harassment.[4] She made very specific references to sexually charged comments, coupled with invasive physical contact, which Plaintiff believed was "too initimate" in the workplace. *See Bonar,* 2010 U.S. Dist. LEXIS 30116, at *11 (quoting *Williams v. General Motors Corp*., 187 F.3d 553, 563 (6th Cir. 1999) ("[T]he presence of an element of 'physical invasion' renders the context more severe than harassing comments alone.") She also indicated that Willing' "had managed to humiliate [her] by sexual inference," leaving her feeling "degraded." (Written

---

[4] The record demonstrates unequivocally that Defendant viewed the complaint as one sounding in sexual harassment. Conner's notes from her conversation with McBroom indicate that "Pat said that her concern was sexual harassment […], and that she believed that she had been subjected to "overt sexual references." (Doc. No. 34-1, BN32.) Feagins also treated Plaintiff's complaint as one sounding in sexual harassment. While the ultimate inquiry must focus on what the reasonable employee would have believed when making the complaint, management's response is at least some evidence as to the reasonableness of the complaint. *But see Smith v. Good Samaritan Hospital*, 2007 U.S. Dist. LEXIS 48304, at *30 (S.D. Ohio July 3, 2007) (questioning, in dicta, the "novel" argument that the plaintiff was engaged in protective activity because her employer perceived it as such).

Complaint at BN30.) Viewing the evidence in a light most favorable to Plaintiff, the Court must conclude that Plaintiff has come forward with sufficient evidence to establish a genuine issue of material fact as to whether she had engaged in protected activity. *See, e.g., Finch,* 689 F. Supp. 2d at 966 ("Whether Plaintiffs lodged their complaints in good faith is quintessentially a credibility question for the jury to decide. Obviously, Plaintiffs' demeanor and the degree to which there was evidence to support their discrimination claims bears on their credibility and good faith, but those issues cannot be decided on summary judgment."); *Marter v. JE Johnson Contr., Inc*., 2010 U.S. Dist. LEXIS 44194, at *25-*26 (E.D. Mich. Apr. 30, 2010) (genuine issue of material fact as to whether the plaintiff had a good faith belief that the opposed practices were unlawful).

> 2. *Materially Adverse Employment Action*

An adverse employment action is one that results in a "materially adverse change [to] the terms and conditions of [] employment [...]." *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). Defendant treats Plaintiff's 2008 discharge as the relevant adverse employment action. Plaintiff, however, insists that the negative performance evaluations and the PDPs that preceded her discharge must also be considered.

In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Supreme Court took an expansive view of the type of conduct that qualified as materially adverse: "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 71 (internal quotation omitted). While the Court noted that "trivial

harms" did not receive protection, the Court explained that it phrased the standard in general terms "because the significance of any given act of retaliation will often depend on the particular circumstances." *Id*. at 69. *See Halfacre v. Home Depot, U.S.A., Inc*., 221 Fed App'x 424, 432 (6th Cir. 2007). Thus, for example a "[s]upervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Burlington*, 548 U.S. at 69 (citing 2 EEOC 1998 Manual § 8, p. 8-14.)

Applying this rather inclusive interpretation of "materially adverse" to performance appraisals, the Sixth Circuit has held that: "[i]f the Supreme Court views excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement as materially adverse conduct, *see Burlington*, 126 S.Ct. at 2415-16, then markedly lower performance-evaluation scores that significantly impact an employee's wages or professional advancement are also materially adverse."[5] *Halfacre*, 221 Fed. App'x at 433. *See, e.g., White v. Baxter Healthcare Corp*., 533 F.3d 381, 403 (6th Cir. 2008) ("By receiving a lower salary increase than he would have without the more negative evaluation, White was denied an increase in pay to which he allegedly was entitled. Under our precedent, such a deprivation of increased compensation does constitute an adverse employment action.") *See Tuttle v. Metro. Gov't*

---

[5] In *Halfacre,* the court found significant the fact that there was evidence that the plaintiff's raises were tied to his performance appraisals. The court ultimately remanded the matter to the district court to determine the extent to which the lower scores impacted his earning potential. *Id.*

*of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007) (While "a negative performance evaluation does not [alone] constitute an adverse employment action," it can if "the evaluation has an adverse impact on an employee's wages or salary."); *James v. Metro. Gov't of Nashville*, 243 Fed. App'x 74 (6th Cir. 2007). *But see Novotny v. Elseiver Reed*, 291 Fed. App'x 698, 703 (6th Cir. 2008) (applying pre-*Burlington* authority to find that providing greater scrutiny of an employee's calendar, requiring the employee to submit self-evaluations earlier than her co-workers, and placing her on a performance plan did not constitute adverse actions).

        In the wake of *Burlington*, courts have also considered poor performance appraisals that form the basis of an eventual dismissal to be materially adverse. *See, e.g., Tuttle*, 474 F.3d at 323 ("[D]istrict court could have found that the unfavorable job performance appraisals […] likely resulted in both [plaintiff'] transfer […] and, later on, her termination from employment."); *Keys v. Humanna, Inc.*, 2010 U.S. Dist. LEXIS 75096, at *8 (W.D. Ky. July 23, 2010) (properly supported allegation that downgraded evaluation eventually resulted in discharge was sufficient to make out an adverse action); *Reitz v. City of Mt. Juliet*, 2009 U.S. Dist. LEXIS 118170, at *20 (M.D. Tenn. Dec. 18, 2009) ("reprimands led directly to Reitz's suspension [..] and to her eventual termination"). *See Bacon v. Honda of Am. Mfg., Inc.,* 192 Fed. App'x 337, 344 (6th Cir. 2006) (negative evaluations that are used to support a discharge can be considered adverse employment actions).

        Plaintiff has come forward with evidence that the negative performance reviews and the PDPs had a negative impact on her salary. With the exception of 2003, for every year from 1998 to 2007, Plaintiff received overall ratings of "meets standards"

or "above standards" and pay raises. (Conner Dep., Ex. B.) In fact, she received a positive performance review and pay raise in March 2007, less than a month before she complained about Willings's behavior. (Conner Dep., Ex. B.) In 2008, following a series of negative performance appraisals and multiple performance development plans, she received a "not at standards" rating, and no raise. (Conner Dep., Ex. B.) This evidence, alone, meets the relatively low standards for a prima facie case of retaliation.[6] *See Michael*, 496 F.3d at 596. *See, e.g., White*, 533 F.3d at 403 (evidence that employee received lower salary increase than he would have without the negative evaluation was sufficient to establish the existence of an adverse employment action).

Moreover, there is evidence in the record that the negative appraisals and performance plans supplied the necessary foundation for Plaintiff's eventual separation. Plaintiff's immediate supervisor, who was responsible for Plaintiff's many write-ups, testified that "We had […] taken notes for how long and documented [Plaintiff's] performance. It seemed clear to me that […] the reasons for her termination were already documented."[7] (Conner Dep. at 127-28.) Viewing this evidence in the light most favorable to Plaintiff, the Court finds that it is sufficient to withstand summary judgment on the question of whether the negative performance reviews and performance development plans constituted a materially adverse action. *See Sanford v. Main St.*

---

[6] Defendant does not deny that Plaintiff failed to receive a salary increase following the 2008 appraisal and plans. Instead, it argues that Plaintiff has not proven that she would have received a raise if her evaluation had been more positive. Of course, Plaintiff need only make a prima facie case here. At a minimum, her evidence creates a genuine issue of material fact. At trial, Defendant may argue that, due to the weak economy, Plaintiff would not have received a raised with even a positive evaluation.

[7] While Conner did not make the ultimate decision to discharge Plaintiff, she was Plaintiff's immediate supervisor, and she prepared the negative evaluations and PDPs that led to Plaintiff's discharge. There is also evidence in the record to suggest that Conner participated in management discussions regarding Plaintiff's discharge. (*See* Mahoney Dep. at 55.)

*Baptist Church Manor, Inc*., 327 Fed. App'x 587, 599 (6th Cir. 2009) (finding that the district court erred in determining that a supervisor's write-ups "were not in fact materially adverse.").

> 3.    *Causal Connection*

The final prong of the prima facie case is "causation." "The burden of establishing the 'causal link' element of a prima facie case is much less onerous than the standard for proving 'but-for' causation required for the determination of the ultimate issue of retaliation." *EEOC v. Air Liquide Indus. USA LLC,* 692 F. Supp. 2d 658, 670 (S.D. Tex. 2010). "'To show causation, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct.'" *Lamer v. Metaldyne Co. LLC*, 240 Fed. App'x 22, 29 (6th Cir. 2007) (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002)).

"When an employee is disciplined in close proximity to his or her protected activity, such proximity provides 'highly probative evidence of a causal connection' between the adverse employment action and the protected activity." *Howington v. Quality Rest. Concepts, LLC*, 298 F.3d App'x 436, 446 (6th Cir. 2008) (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008)). Causation can also be inferred if an employee faces higher disciplinary scrutiny than similarly situated employees, *Little v. BP Exploration & Oil Co*., 265 F.3d 357, 364-65 (6th Cir. 2001), or if an employee faces higher scrutiny than she faced before filing a harassment complaint. *Cantrell v. Nissan N. Am. Inc*., 145 Fed. App'x 99, 106-07 (6th Cir. 2005).

In contrast, "where some time elapses between when the employer learns

18

of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey v. Zeider Tool & Die Co*., 516 F.3d 516, 525 (6th Cir. 2008). *See Tuttle*, 474 F.3d at 321 (In general, "[t]he law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim.") For example, in *Martin v. GE*, the Sixth Circuit found that an eleven month interval between the filing of an EEOC complaint and an adverse employment action was not short enough, by itself, to establish a causal connection. 187 Fed. App'x 553, 561 (6th Cir. 2006). Similarly, in *McDaniel v. Potter*, the court found a termination occurring eight months after the protected activity was too remote in time, standing alone, to create an inference of retaliation. 2007 U.S. Dist. LEXIS 79573, at *58 (N.D. Ohio Oct. 26, 2007). *See, e.g., Parnell v. West*, 1997 U.S. App. LEXIS 12023, at *8 (6th Cir. May 21, 1997) ("A time lag of seven months does not necessarily support an inference of a causal link; previous cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months.")

        Defendant argues that Plaintiff's discharge, occurring some fifteen months after she first complained about the alleged harassment, is too remote in time to establish the necessary causal nexus. Plaintiff, however, points to the June 16, 2007 Performance Development Plan she received, noting that it was issued less than two months after she made her report to Conner. Having determined that the performance development plan was an adverse action, along with other negative reviews and plans issued shortly thereafter, the Court finds that Plaintiff has come forward with evidence sufficient to establish a temporal connection between her protected activity and possible retaliation.

*See Air Liquide USA LLC*, 692 F. Supp. 2d at 671 (While discharge occurred approximately five months after protected activity, a rational juror could have concluded that the decision had been made months before). In fact, a gap of less than two months is highly suggestive of retaliation.[8] *See, e.g., Goller v. Ohio Dept. of Rehab. & Corr.*, 285 Fed. App'x 250, 257 (6th Cir. 2008) (gap of two months sufficient); *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555 (6th Cir. 2004) (three month gap sufficient to establish causation).

Further temporal evidence supports a finding of causation. It is clear from the record that Plaintiff was subjected to a higher level of scrutiny after she reported her concerns to her supervisor.[9]  Moreover, Conner admits that she did increase documenting Plaintiff's behavior more vigorously after June 16, 2007, (*see* Conner Dep. at 72), but claims that this was dictated by Defendant, who had put into place new "competencies" that encouraged more vigorous documentation of all employees. (Conner Dep. at 78.) This higher level of scrutiny further supports a finding of causation. *See Cantrell*, 145 Fed. App'x at 106-07.

Defendant argues, however, that it had legitimate concerns regarding Plaintiff's performance long before Plaintiff spoke with Conner about Willings.

---

[8] One could argue that the gap between the protected activity and the adverse action was even less than two months. On May 25, 2007, Conner issued Plaintiff a Field Management Learning Plan. While Defendant insists that these plans are not "negative" and are, instead, "learning tools," (*see* Conner Dep. at 53), the relevant question here is not whether this plan was constructive, but whether it was materially adverse. *See Halfacre*, 221 Fed. App'x at 433 (rejecting employer's argument that negative evaluation comments and scores were nothing more than constructive criticism). If the learning plan is considered the relevant adverse action, the gap shortens even further to a matter of weeks.

[9] In fact, Conner admits that, prior to the date Plaintiff first complained about Willings, she had never documented any negative behavior of Plaintiff to human resources. (Conner Dep. at 42.) Also, in an Assessment, Conner indicated that she found Plaintiff to be "a very knowledgeable, capable, well-rounded and professional 'hands on' manager." (Doc. No. 34-2, BN153.)

"[E]vidence that the employer had been concerned about a problem before the employee engaged in protected activity undercuts the significance of the temporal proximity." *Sosby v. Miller Brewing Co.*, 415 F. Supp. 2d 809, 822 (S.D. Ohio 2005) (quoting *Smith v. Allen Health Sys.*, 302 F.3d 827, 834 (8th Cir. 2002)). District Manager Feagins testified that there were a "myriad" of problems,[10] noting that Plaintiff had an on-going problem with keeping confidential information, (Feagins Dep. at 111), she was not welcoming to new employees, (*Id.* at 69), was often guilty of overspending store money indiscriminately, (*Id.* at 108), and struggled with managing the performance of her subordinates. (*Id.* at 109.) He also noted that she had difficulty with change, and was not competent with the new "tools" that were available to assist store management in the administration of their duties.[11] (*Id.* at 109.)

It is telling, however, that none of these alleged concerns were ever documented prior to April 2007. In fact, the difficulty with change, the use of Company "tools," overspending, and Plaintiff's alleged unwelcoming attitude were never documented in any appraisal or development plan. Indeed, Feagins admits that there was no "concrete evidence" to support these concerns. (Feagins Dep. at 119.) While he points to the 2003 PDP as an example of the documentation of pre-existing performance issues, it is clear that all management employees at the Boardman store were issued such a plan in 2003; as such, a fair assessment of the plan suggests that it was issued to address the

---

[10] Feagins's opinion regarding Plaintiff's performance issues is contracted by the deposition testimony of Conner, who testified that had she had any prior concerns regarding Plaintiff's performance, she would have addressed them in a PDP. (Conner Dep. at 30.) Of course, Conner admits that she was disciplined in her 2003 PDP for being reluctant to document performance issues. Nonetheless, these differing views of management create further issues of fact.

[11] Specifically, Feagins testified that Plaintiff appeared unwilling to user certain recordkeeping tools, such as the "category report," which apparently was used to track spending. (Feagins Dep. at 108.)

problems at the Boardman store, rather than Plaintiff's individual pre-existing performance problems. (Conner Dep. at 139.) This conclusion is buttressed by the fact that the issues identified in the 2003 PDP, Plaintiff's lack of knowledge of the music and café departments and specific instances involving employees, do not appear in any prior or subsequent written discipline.[12]

As for the concerns regarding Plaintiff's alleged inability to keep confidentialities, this is documented, but not until after April 2007.[13] While Plaintiff admits that she discussed her sexual harassment complaint with a subordinate, Amy Neral, this fact does not necessarily detract from evidence that Defendant appeared willing to tolerate this behavior until Plaintiff engaged in protected activity. "[W]here an employer treats an employee differently after she [engages in protected conduct] than before she had done so, a retaliatory motive may be inferred." *Lamer*, 240 Fed. App'x at 30. *See Cantrell*, 145 Fed. App'x at 106 (Evidence that employer tolerated the employee's inability to get along with her co-workers for years, and did not discipline it until after the employee had engaged in protected activity, supported an inference of retaliation); *Reitz*, 2009 U.S. Dist. LEXIS 118170, at *27 ("[E]ven if [the employee] was consistently tardy throughout her tenure at the City, she has presented evidence that she was regularly reprimanded and fired for it only after she filed her complaint.") Because Plaintiff has come forward with some evidence that she was treated differently after she

---

[12] It is also supported by Conner's observation that the issuance of the 2003 PDPs to the Boardman store management employees was, in large measure, the result of the store's poor "statistics." (Conner Dep. at 139.)

[13] Conner testified that employee Amy Neral may have complained about Plaintiff's habit of sharing confidential information at the beginning of 2007, but admits that it was not documented until after April 2007. (Conner Dep. at 58.)

engaged in protected activity, she has created a genuine issue of material fact as to causation.

Finally, with respect to causation, the evidence, if believed, would support an inference that Defendant had made the decision to terminate Plaintiff within a few short months of the sexual harassment complaint, and that the delay in discharging was occasioned solely by a desire to build a case against Plaintiff to support the termination. Plaintiff's immediate supervisor, Conner, testified that by July 23, 2007, only three months after the sexual harassment complaint, she was actively looking for a replacement for Plaintiff. (Conner Dep. at 159.) Moreover, by August 2007, Feagins, the ultimate decision-maker, had contacted his superior, Mahoney, to discuss Plaintiff's discharge. (Mahoney Dep. at 37.) Feagins, this time along with Conner, contacted Mahoney again in October 2007 to revisit the issue of discharge. Mahoney did not recommend discharge at that time, however, because Feagins did not yet have everything "lined-up." (*Id.* at 55-56.)

"Th[is] evidence indicates a concerted effort to terminate Plaintiff rather than any legitimate concerns regarding job performance […]." *Brooks v. Maryland*, 2010 U.S. Dist. LEXIS 39447, at *25-*26 (D. Md. Apr. 20, 2010). *See Air Liquide USA LLC*, 692 F. Supp. 2d at 671 ("[T]here is a question of fact about why [the employer] began actively documenting performance lapses immediately after [the employee] made her claim when there is essentially no documentation of such issues prior to her claim.") Without question, Plaintiff has come forward with sufficient evidence to withstand summary judgment on the issue of causation.

23

B.        **A Legitimate, Nondiscriminatory Reason for Termination**

       Having come forward with sufficient evidence to establish a prima facie case of retaliation, the burden shifts to Defendant to advance a legitimate, non-discriminatory reason for the adverse employment actions. Defendant insists that Plaintiff was discharged for poor performance, and that it went to great lengths, as evidenced by the multiple PDPs that were issued to Plaintiff, to attempt to correct her behavior before she was ultimately terminated. This showing is sufficient to satisfy Defendant's burden of production on this issue, and to send the burden back to Plaintiff to demonstrate pretext.

C.        **Pretext**

       "To meet [her] burden on pretext, the plaintiff must produce evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason." *Haughton v. Orchid Automation*, 206 Fed. App'x 524, 531 (6th Cir. 2006). *See Michael*, 496 F.3d at 597; *Lamer*, 240 Fed. App'x at 1083. Plaintiff "can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002) (internal citation omitted).

       The evidence used to show pretext can be the same evidence used to establish a causal connection between the protected activity and the materially adverse action; this evidence "if sufficiently strong, also necessarily rebuts a proffered legitimate, non-discriminatory reason for the adverse action. *Cantrell,* 145 Fed. App'x at 107, 108 n.2.

       Here, the evidence already discussed—in particular, evidence that Plaintiff

24

only started receiving frequent reprimands after she engaged in protected activity, and evidence that the decision to discharge had been made long before the 2008 discharge— is "sufficient to show that [the employer's] conduct was driven by a desire to retaliate."[14] *Reitz*, 2009 U.S. Dist. LEXIS 118170, at *25.

In the first nine years of employment with Defendant, Plaintiff received consistently positive performance appraisals and only one PDP. Within two months of engaging in protected activity, she received her second PDP. In the last year of her employment, she received multiple negative performance appraisals and four PDPs, in all. The increase in monitoring and documentation could support a jury verdict in favor of Plaintiff and, at a minimum, creates a jury question as to the falsity of Defendant's proffered legitimate reason.[15] *Id.* at *25. *See also Few v. Yellow Freight Sys.*, 845 F.2d 123, 124 (6th Cir. 1998) (In affirming the judgment in favor of the employee, the court highlighted the fact that the "the dramatic increase in the number of write-ups in [the employee's] file is well-documented in the record.")

Defendant resists this conclusion, noting that the multiple PDPs actually reflect management's efforts to correct Plaintiff's behavior to avoid the need for termination.[16] It also underscores the fact that, in her performance appraisals before April 2007, Plaintiff admitted that she knew that she had areas in which she could improve her

---

[14] Plaintiff also points to the fact that while the unflattering e-mail Willings prepared, which contained his "petty" complaints about Plaintiff was placed in her personnel file, Plaintiff's written complaint against Willings did not find its way to Willings's file. (Conner Dep. at 81-82; Feagins Dep. at 61-65.) This disparate treatment lends further support for an inference of retaliation.

[15] The fact that Conner insists that management was encouraged to increase documentation of all employees, at best, demonstrates that there are disputed fact questions that must be resolved by a trier of fact.

[16] Defendant argues that, because Plaintiff was a long-time employee, it was willing to extend her multiple opportunities to avoid discharge. (Doc. No. 41, Reply at 8.)

25

performance, and further admitted that she had not followed through in confirming that a subordinate had prepared a display in the store prior to a store audit.[17] (McBroom Dep. at 188-89.) Neither argument can secure Defendant summary judgment. It is true that an employee's admissions in a self-evaluation that there are deficiencies can be some evidence that any subsequent discipline was not discriminatory. *See Evans v. Toys R Us*, 2000 U.S. App. LEXIS 14076, at *34 (6th Cir. June 2, 2000). These admissions do not, however, entitle Defendant to summary judgment where there is also evidence that Defendant tolerated certain deficiencies in Plaintiff's performance until she engaged in protected activity.[18] *See, e.g.,Cantrell*, 145 Fed. App'x at 106; *Reitz*, 2009 U.S. Dist. LEXIS 118170, at *27-*28 (evidence that employer tolerated plaintiff's tardiness until she engaged in protected activity created an inference of retaliation sufficient to withstand summary judgment). Moreover, Defendant's view of the PDPs as constructive criticism is inapposite where there is evidence that the PDPs formed the basis for Plaintiff's eventual discharge.

Viewing the evidence in a light most favorable to Plaintiff, a reasonable juror could conclude that Defendant engaged in a concerted effort to build a case to

---

[17] For example, in 2006, Plaintiff wrote in her self-evaluation "I need to focus on coaching, motivating and developing others." (McBroom Dep. at 123, Ex. 9.) Also in 2006, Plaintiff completed a talent assessment, in which she rated herself as "inconsistently demonstrating" competencies in: developing talent, operational execution and acting with integrity and trust. (*Id*. at 227, 280, 282, Ex. 25.)

[18] The Court also questions the evidentiary value of this evidence. Plaintiff's "admissions" were offered as part of the evaluation process, where even the highest performing employees were required to identify their individual strengths and areas where they would like to see improvement. By identifying such areas, Plaintiff was not admitting that her performance was deficient in these areas or that her performance made her a candidate for discharge. Instead, she was merely identifying the performance goals she had for the future. (*See* Doc. No. 34-2, Goal Development Plan, calling for "Performance Strengths" and "Areas to be Developed.") Of course, the Court will leave to the jury the question of the proper weight to afford this evidence.

terminate Plaintiff in retaliation for her protected activity.[19] The increased scrutiny and the aggressive disciplinary measures taken against Plaintiff, beginning shortly after Plaintiff made her sexual harassment complaint, support an inference of retaliation. Finally, evidence that management had made its decision to discharge Plaintiff within two months of the complaint, if believed, is strong evidence of retaliation. As the evidence creates significant questions of fact, it must be left for the jury.

**Conclusion**

For all of the foregoing reasons, Defendant's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED**.

Dated: October 8, 2010

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[19] In light of the fact that the Court finds that Plaintiff has come forward with sufficient evidence of pretext to stave off summary judgment, the Court needed not determine whether the "similarly situated" employee to which she makes reference, John Freeze, is truly "similarly situated" for purposes of comparison.